UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

PATRICK C. KELLEY                                      CIVIL ACTION

VERSUS                                                NO. 12-2654

CAROLYN W. COLVIN, ACTING                             SECTION "B" (2)
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION[1]


**FINDINGS AND RECOMMENDATION**

Plaintiff, Patrick C. Kelley, proceeding pro se, seeks judicial review pursuant to

Section 405(g) of the Social Security Act (the "Act") of the final decision of the

Commissioner of the Social Security Administration (the "Commissioner"), suspending

payment of plaintiff's early old-age retirement benefits under Title II of the Act.  42

U.S.C. §§ 403, 405(g).  This matter was referred to a United States Magistrate Judge

pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2(B).

Instead of filing a memorandum of facts and law as ordered, Record Doc. No. 10,

plaintiff filed a motion for summary judgment, to which he attached his own affidavit and

three documents.  Record Doc. No. 13.  Defendant filed a timely reply memorandum of

facts and law.  Record Doc. No. 17.

---

[1]Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on
February 14, 2013.  Pursuant to Fed. R. Civ. P. 25(d), Colvin is automatically substituted for the former
Commissioner of Social Security, who was the original named defendant.

I.     PROCEDURAL HISTORY

Kelley, who is an attorney in a solo practice, filed an application for early old-age retirement benefits in October 2009.  (Tr. 18-19).  The Commissioner approved the application, finding that plaintiff was eligible for benefits effective December 2009, the month after he reached age 62.  However, the Commissioner withheld any benefit payments because Kelley, who admittedly continued to work at least part-time, refused to provide adequate proof of his earnings.  (Tr. 35-37, 41-44).

In his October 2009 application, Kelley stated that his posted earnings were correct.  He noted that he had never earned more than $87,900 from his self-employment as an attorney, that 2004 was the year of his largest earnings and that he had significantly reduced his earnings since then due to open heart surgery in 2007.  He stated that he could then provide an estimate of his 2009 earnings, but that the annual earnings test had been explained to him and that he understood it.  (Tr. 19).

Plaintiff and the Commissioner agree that, under the annual earnings test, a person who is eligible to receive old-age retirement benefits before the normal retirement age can work and earn some income without affecting his benefits.  However, benefits will be reduced by one dollar for every two dollars earned over the annual exempt amounts of $14,160 in the years 2009 through 2011 or $14,640 in 2012.  42 U.S.C. § 403(f)(3); 20 C.F.R. §§ 404.415, 404.430; Social Security Administration, "Exempt Amounts

Under the Earnings Test," http://www.socialsecurity.gov/OACT/COLA/rtea.html (last visited July 25, 2013).

The Commissioner's initial Notice of Award to plaintiff dated November 10, 2009 stated that his application for early old-age retirement benefits was approved and that his monthly benefit amount would be $1,101.90.  However, the agency notified Kelley in the same letter that it is "withholding all of your benefits for 2009 [and 2010] because of work and earnings" because "[y]ou estimated that you would earn $999,999.99 in 2009 and . . . 2010."  (Tr. 35).

Nowhere in this letter or in any subsequent notices did the Commissioner explain to Kelley that $999,999.99 was a default amount that is entered when a claimant fails to submit adequate documentation of his income and the Commissioner decides to withhold benefits for that reason.  The Administrative Law Judge ("ALJ") finally explained this to Kelley at the hearing.  (Tr. 130).

Plaintiff requested reconsideration based on what he termed a "total lie" and "figures made up by" the Social Security Administration regarding his estimated income.  (Tr. 38).  After his request for reconsideration was denied, he sought a hearing before an ALJ, which was held on September 8, 2010. (Tr. 125-48).  At the hearing, Kelley waived his right to be represented by counsel.  (Tr. 128).  On January 26, 2011, the ALJ issued a decision affirming the decision to withhold benefits.  (Tr. 12-17).  After the Appeals

Council denied review on August 28, 2012, the ALJ's decision became the final decision of the Commissioner for purposes of this court's review.  (Tr. 3-5).

II.    STATEMENT OF ISSUE ON APPEAL

Plaintiff contends that the ALJ made the following error:

A.    The ALJ's opinion is not supported by substantial evidence.

III.   ALJ'S FINDINGS RELEVANT TO ISSUE ON APPEAL

The ALJ made the following relevant findings:

1.    Kelley is eligible to receive early retirement benefits.  He continued to work at his private law practice on a nearly full-time basis after attaining age 62 in November 2009.

2.    He failed to provide documentation of his earnings from his ongoing work activity for 2009 and 2010.  Therefore, he has not proven that his ongoing work activity produces earnings at or below the annual exempt amount for 2009 or 2010.

3.    When the Commissioner asked Kelley to document his 2009 earnings, he replied that he could not estimate his 2009 earnings because the cases he handles vary in payments and his income depends on the cases that come through his door.  He replied "non-applicable" or "none" to questions regarding his income or earnings on his Self-Employment/Corporate Officer Questionnaire.

4.    Plaintiff worked as much or as little as he wanted or needed to, depending on his case load.  His income is within his control.

5.    On another form, he wrote that his "estimated net for self employment earnings purposes [for 2009] is less than $15,000.00."  He did not provide any documentation of this amount, such as a quarterly self-employment tax return or any internal accounting documents.

6.   For 2010, Kelley repeated that he had no way of estimating his future 2010 income because he did not know what cases would come into his office.

7.   Although the agency made repeated attempts to obtain some type of documentation of plaintiff's earnings in 2009, he steadfastly held to his "vague, unsubstantiated claim of earning less than $15,000.00." Citing "vague info," the agency concluded that it had no way to determine his earnings in 2009 or 2010. Therefore, the agency listed his earnings for those years as $999,999.99.

8.   It is reasonable that Kelley could not precisely estimate his 2010 earnings in 2009, but it is not reasonable that he was unable to provide a reasoned projection in light of his testimony that he cut back, chose not to work too hard and works as hard as he wants to; that his client base is middle class, upper middle class and wealthy; and that he knew the exact amounts he could earn without jeopardizing his expected retirement benefit.

9.   It is not reasonable to believe that plaintiff possessed not one shred of objective documentation of his income from January through at least October 2009. Consequently, it was not possible at that time for the agency to reasonably conclude that retirement benefits would not be subject to deductions for all or part of 2009.

10.   The only income evidence of record is an earnings query generated by the agency and provided to the claimant. This record showed income of $19,523 in 2007, but no income in 2008 and 2009.

11.   Kelley bears the burden to prove that his 2009 earnings and his earnings for each year before reaching full retirement age do not result in a reduction of his monthly retirement benefits. His reliance on the agency income report, which showed zero earned income in 2009, is not proof of no income because a self-employed individual could achieve the same result by simply failing to file a tax return.

12.   By September 1, 2010, the agency's official earnings record no longer showed zero dollars earned in 2008, but showed that plaintiff had earned $5,856. However, his earnings record continued to show zero dollars earned in 2009.

13.    Kelley testified that he had not submitted a 2009 tax return into the administrative record.

14.    Because he was working at a just-less-than-full-time level and chooses the kinds of cases he wants, and he strongly suggested that he turned cases away, his yearly income likely exceeds the annual exempt amount for 2009 and 2010.

15.    Plaintiff provided no objective proof of his earnings.  If he has reasonable and allowable business expenses that reduce his income for tax purposes, he should have documentation of some kind sufficient to appease the Internal Revenue Service.

16.    This is the type of documentation that he must submit to the Commissioner to meet his burden of proof.  Purely subjective assertions are insufficient to demonstrate his eligibility for early retirement benefits.

17.    Kelley's claim for early retirement benefits is denied based on his failure to prove his financial eligibility for such benefits.

(Tr. 13-16).

IV.    ANALYSIS

A.    Standards of Review

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence.  Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005); Waters v. Barnhart, 276 F.3d 716, 716 (5th Cir. 2002); Loza v. Apfel, 219 F.3d 378, 390 (5th Cir. 2000).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as

6

adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971);

Perez, 415 F.3d at 461; Loza, 219 F.3d at 393.  This court may not "reweigh the evidence

in the record, try the issues de novo or substitute its judgment for the Commissioner's,

even if the evidence weighs against the Commissioner's decision." Newton v. Apfel, 209

F.3d 448, 452 (5th Cir. 2000).  The Commissioner, rather than the courts, must resolve

conflicts in the evidence.  Id.

The ALJ is entitled to make any finding that is supported by substantial evidence,

regardless whether other conclusions are also permissible.  See Arkansas v. Oklahoma,

503 U.S. 91 (1992).  Despite this court's limited function, it must scrutinize the record

in its entirety to determine the reasonableness of the decision reached and whether

substantial evidence supports it.  Perez, 415 F.3d at 461.  Any findings of fact by the

Commissioner that are supported by substantial evidence are conclusive.  Id.; Newton,

209 F.3d at 452; Martinez v. Chater, 64 F.3d 172, 173 (5th Cir. 1995).

B.    Factual Background

Kelley waived his right to counsel.  (Tr. 128).  He testified that he completed law

school and obtained a J.D.  He said he represents Social Security disability claimants and

had just deposited a check for winning a case.  He stated that he never told the Social

Security Administration that he was totally retired, but told them that he cut back on the

amount of work he did and that his income varied greatly from year to year.  (Tr. 131-

32).  He testified that his income on his earnings record for Social Security purposes for 2001 was zero, while his income in 2004 was $87,900 and in 2008 was $5,600.

Plaintiff stated that he understood when he visited the Social Security office on October 15, 2009, that he was eligible for benefits as long as he did not make more than about $14,000 in earned income and that, for every two dollars he earned over that amount, Social Security would withhold a dollar.  He testified that he does not work too hard any more because he lost a lot of business after Hurricane Katrina and because he had open heart surgery on November 1, 2007.  He said he was sick from around July or August 2007 to around March 2008, and that his mother passed away in March 2008, so he chose not to work too hard after that.  (Tr. 132).

Kelley testified that he had been lucky in that his family "was always fairly well-off" and that he had inherited money from his grandmother and mother.  He said he did not need to work too hard because of that and that "basically, I work as hard as I want. . . .  Most of my client base is middle-class, upper middle-class, and wealthy."  (Tr. 133).  He stated that some of his client base left town after Hurricane Katrina and that most of his trial work before that time was referred from other lawyers, who no longer refer personal injury cases to him.  He explained that he netted $87,900 in 2004 from a single case.  He said he no longer does much personal injury work and now handles a lot of domestic work and about three to four Social Security disability cases per year, from which he does not make a lot of money.  (Tr. 133-34).

8

Plaintiff stated that he had given the Social Security Administration "a little statement concerning my '09 income, which is totally accurate," although he "didn't total up all of the expenses." He explained that he had obtained an extension until October 15, 2010 to file his 2009 tax return, so he did not have a tax return when he provided this statement. Kelley "assure[d] the court when I said my earned income for '09 was approximately $35,000 gross[,] that is a totally accurate figure." He stated that deducting round numbers of $10,000 for rent, $10,000 for "casual labor" for a paralegal who works two days a week, and $3,600 for professional liability insurance, without even including other expenses for such items as postage, office expenses and professional dues, "I am well below the threshold for '09." (Tr. 134). He said he had figured his income through August 31, 2010, at approximately $18,006.80 gross, which he felt was "almost 99 percent accurate." He stated that deducting just the casual labor and office expense from this amount put his net income below zero. However, he stated that he had just deposited into his account $29,080 that he earned from a Social Security disability case.

Kelley testified that he had filed a tax return for 2008 and that his Social Security earnings record reflected that he had earned about $5,600 that year. He said his gross income that year was around $40,000. He stated that he had just filed his 2008 return when he applied for early retirement benefits and that he estimated his 2009 income at that time as "less than $15,000 as earned income, which was obviously accurate." (Tr. 135). He did not recall being asked for a tax return when he had the initial meeting with

a Social Security representative.  He testified that he never filed any tax return with any Social Security office with respect to this claim.  He confirmed that he works at his own pleasure, whenever and however he wants.

Plaintiff stated that his "casual labor" is his wife, Lynn Kelley, and that she has worked for him since before Hurricane Katrina.  He said she has gone from originally working four days per week to three to two days, and that now "she, kind of, works when she wants to."  (Tr. 136).  He testified that she comes in and does some typing when he needs it.  He said that a different woman had worked for him three to four days per week before his wife started helping him, but the previous worker died.

Kelley testified that he handles three to six Social Security disability cases per year.  He stated that he does not advertise, his cases are based on referrals from other clients, and about 70 percent of his law practice is domestic matters.  (Tr. 137-38).  He said the other 30 percent is Social Security, small amounts of plaintiff's personal injury and medical malpractice, some succession work and some defense work.  He stated that the last time he worked on a medical malpractice case was as the attorney chairman of a medical review panel.  (Tr. 138).

When asked how the way he practices law differs from six years ago, plaintiff said that his office is closed on Fridays and that no one is in the office on Mondays, except him.  He said he normally goes to work about 11:00 a.m. and leaves around 1:00 p.m. He said his part-time secretary usually comes in two days a week, but sometimes it is

only one and sometimes none.  He stated that he gets no walk-in business, so there is no reason for him to sit in the office, and most of his clients know how to reach him on his cell phone or at home.  He explained that he only takes scheduled appointments between 10:30 a.m. and 1:30 p.m., "and I don't work too hard."  (Tr. 139-40).

Kelley said that all of his cases come from referrals from other clients and lawyers. He stated that he does not refuse any cases that he could win.  He explained that he will handle a personal injury or medical malpractice claim if he thinks he has a legitimate chance of winning the case.  He said he will always take a defense case if the client can afford to pay his fees.

Plaintiff testified that his clients in domestic cases must be able to pay a minimum fee and that he will handle a matter if he believes the client is telling the truth, because there are no winners or losers in domestic cases.  (Tr. 140).  He said his minimum fee varies depending on how complicated the case is, such as whether the client is seeking a restraining order or injunctive relief, whether there is community property, or whether the client has children and seeks child support and/or spousal support.  He stated that he might charge anywhere from $25 to $5,000 up front, that his standard hourly rate is $255 and that the client pays all costs.  He said that one reason he never handled much personal injury business, although he liked the work, was that he would not advance costs, pay medical expenses or loan money to clients.

11

Kelley stated that one of the last medical malpractice cases he handled involved a young woman who had recently had dental work to make her teeth prettier and then needed "some type of nominal female surgery." (Tr. 141). He said she told the anesthesiologist to be very careful when putting the tube in her throat so as not to mess up her dental work, but that the anesthesiologist broke all of her front teeth and "she had all kind of damages as a result of that in surgery." He testified that he did not win that case because the anesthesiologist's duty of care was to keep the patient safe during the medical procedure, not to ensure that her teeth were not broken.

Plaintiff said he handled another recent medical malpractice case for a man who stepped on a nail and went to a dermatologist, who told him to put the foot in Epsom salts. The foot became infected, developed gangrene and had to be amputated. Kelley said he did not prevail before the medical review panel, but the dermatologist ultimately settled for the maximum amount under law after Kelley filed suit. (Tr. 142).

Plaintiff testified that he attends the required number of Continuing Legal Education sessions each year, which is twelve and one-half hours. He stated that in the past year he has appeared in Orleans Parish Civil District Court, where he has two domestic cases ongoing, and in the 24th Judicial District Court, where he has about six domestic cases. He said he normally would appear in St. Charles Parish court several times in a year, but has not had anything there since he settled a contract case earlier this year. (Tr. 143). He stated that in the past he has gone to courts in Baton Rouge and

Covington and that he generally will agree to take cases in any courts between New Orleans and Baton Rouge.  He said he does not do bankruptcies, tax law or criminal work, but occasionally handles a DWI, if he knows the client and thinks he can get the charge reduced or dismissed.  (Tr. 144).

Kelley said he is not ready to retire completely at age 62 and that he is happy to work as long as he can cover his office expenses and make $5,000 to $10,000 above that. He stated that he possibly could receive a referral tomorrow of another case like the one he settled in 2004 for $489,000, but he would be shocked if it happened.  He testified that his reported taxable earnings have fluctuated enormously over his career.  He said that the amount of money he made "depend[ed] on what walks through the door."  He gave an example of having received a referral of a personal injury case from another lawyer who worked on the case and fronted the expenses, and who would get 50 percent of the fee.  (Tr. 145-46).  He repeated that he has been lucky and that in most years he could live comfortably without working himself to death.

Plaintiff testified that he receives oil royalty income of about $5,000 to $6,000 per year.  However, he said that this is not earned income and that he is not involved in any way in managing his oil interests, which strictly yield royalty checks.  (Tr. 146-47).  He stated that he receives $7,200 per year as a retainer from Andrea's Restaurant, which is his only retainer fee client.  (Tr. 147).

C.   <u>Plaintiff's New Evidence</u>

Kelley filed a motion for summary judgment instead of a memorandum of facts and law, as he was ordered to do in this appeal from a final agency decision, which is based solely on the administrative record.  He attached to his memorandum his own affidavit and three pages of exhibits.  Although two of the three pages of exhibits are already in the administrative record, the affidavit and the "Sch. C filed with [2011] tax return," Record Doc. No. 13-3 at p. 5, are not in the record.  Plaintiff also offered to produce his income tax returns to the court if the court wants to see them.  The court treats this portion of his memorandum as a motion for leave to submit new evidence.

It is well established that this court may <u>not</u> issue factual findings on new evidence and may review such evidence only to determine if a remand to the Commissioner is appropriate.  <u>Ferrari v. Astrue</u>, 435 F. App'x 314, 314-15 (5th Cir. 2010); <u>Martinez v. Astrue</u>, 252 F. App'x 585, 587 (5th Cir. 2007) (citing 42 U.S.C.A. § 405(g); <u>Haywood v. Sullivan</u>, 888 F.2d 1463, 1471 (5th Cir. 1989)); <u>Ripley v. Chater</u>, 67 F.3d 552, 555 (5th Cir. 1995).

The court may remand for consideration of new evidence only upon a showing that the evidence is new <u>and</u> material, <u>and</u> that good cause exists for plaintiff's failure to incorporate such evidence into the record in a prior proceeding.  42 U.S.C. § 405(g); <u>Ferrari</u>, 435 F. App'x at 314; <u>Joubert v. Astrue</u>, 287 F. App'x 380, 383 (5th Cir. 2008) (citing <u>Ripley</u>, 67 F.3d at 555); <u>Garson v. Barnhart</u>, 162 F. App'x 301, 303 (5th Cir.

2006) (citing <u>Leggett v. Chater</u>, 67 F.3d 558, 567 (5th Cir. 1995)).  Although these cases involved disability decisions, the court sees no principled reason not to apply the same standards to the proffered new evidence in the instant appeal from the Commissioner's decision to suspend retirement benefits payments.

Evidence which is merely cumulative of that already in the administrative record is <u>not</u> "new evidence" that would support a remand under Section 405(g).  <u>Perkins v. Shalala</u>, No. 93-01940, 1994 WL 523788, at *3 (5th Cir. Sept. 12, 1994); <u>Wilson v. Astrue</u>, No. H-08-01392, 2009 WL 2341803, at *4 (S.D. Tex. July 27, 2009) (citing <u>Pierre v. Sullivan</u>, 884 F.2d 799, 803 (5th Cir. 1989); <u>Bradley v. Bowen</u>, 809 F.2d 1054, 1058 (5th Cir. 1987)); <u>Martin v. Barnhart</u>, No. 02-3574, 2004 WL 1661207, at *3 (E.D. La. July 23, 2004) (citing <u>Pierre</u>, 884 F.2d at 803).

New evidence must be material to be the basis for a remand.  New evidence is only material if there exists a reasonable possibility that it would have changed the outcome of the Commissioner's determination.  <u>Hunter v. Astrue</u>, 283 F. App'x 261, 262 (5th Cir. 2008); <u>Jones v. Astrue</u>, 228 F. App'x 403, 406 (5th Cir. 2007).

Kelley's affidavit merely repeats facts and makes arguments that he already presented at the administrative level.  The supposed Schedule C for 2011, although new in the sense that it does not appear in the administrative record, is in the identical format as the supposed Schedules C for 2008, 2009 and 2010, which are in the record and which the Commissioner already held to be insufficient to carry plaintiff's burden of proof.

15

Thus, the new evidence is merely cumulative and there is no reasonable possibility that it would have changed the outcome.  Accordingly, the affidavit and supposed Schedule C for 2011 are neither new nor material, and no remand is required so that the Commissioner might consider these documents.

As to Kelley's offer to produce his complete tax returns to the court, he has not shown that good cause exists for his failure to incorporate such evidence into the record at the agency level.  "The fact that evidence is 'new', meaning that it did not exist at a point in time such that it could have been incorporated into the administrative record, does not, by itself, constitute good cause for failing to incorporate such evidence into the administrative record."  Wilson v. Astrue, No. H-08-01392, 2009 WL 2341803, at *4 (S.D. Tex. July 27, 2009) (citing Pierre, 884 F.2d at 803).  The agency repeatedly asked Kelley to provide his tax returns during the administrative proceedings, and he repeatedly refused, even after he had filed his tax returns for 2008, 2009 and 2010 with the IRS. Good cause does not exist for him to provide the returns to the court now.

In addition, defendant states in his memorandum that plaintiff "may submit his tax returns to the agency at any time to begin receiving his benefits."  Record Doc. No. 17 at p. 7.  Accordingly, this offer of allegedly new evidence does not require a remand. Plaintiff can simply provide those returns to the Commissioner himself.

D.    The ALJ's Opinion Is Supported by Substantial Evidence

I have reviewed the administrative record and the ALJ's summary of the evidence. (Tr. 13-16).   I find the ALJ's summary of the evidence substantially correct and incorporate it herein by reference.

The ALJ properly applied the law in this case.   Substantial evidence supports the ALJ's findings that Kelley failed to submit his income tax returns or any other objectively verifiable evidence of his income to the agency and that the evidence he did provide was insufficient to bear his burden of proving his entitlement to early old-age retirement benefits.

Plaintiff's contention that the Commissioner bears the burden of proof is unsupported by any law.   As the claimant who seeks early retirement benefits, Kelley bears the burden to show his entitlement to those benefits, including a demonstration that his income does not exceed the annual exempt amount.   A failure to submit adequate evidence of income creates a rebuttable presumption that he had excess earnings.   42 U.S.C. § 403(f)(4)(A); 20 C.F.R. § 404.455.

> Qualified applicants are entitled to retirement benefits.  42 U.S.C. § 402(a).  However, an applicant who is eligible for social security benefits may not work or engage in self-employment which results in income in excess of a certain amount per year.  Id. § 402(f).  "Wages are defined to mean all employment remuneration, irrespective of the name by which the compensation is designated or the way in which it is paid."  Martin v. Sullivan, 894 F.2d 1520, 1531 (11th Cir. 1990) (citing applicable Social Security regulations).

17

> An applicant for benefits <u>must submit the evidence necessary to establish that all entitlement requirements are met, and failure to submit such evidence shall be the basis for the SSA to determine that the conditions for receipt of Social Security benefits have not been met. The claimant, therefore, has the burden of rebutting the presumption of excess earnings under the Act.</u>

<u>Id.</u> at 1531-32 (citations omitted).

> "[T]he [Commissioner] has the right to examine the substance over the form of business transactions and relationships for purposes of the Social Security Act." <u>Heer v. Secretary of Health & Human Services</u>, 670 F.2d 653, 655 (6th Cir.1982) (per curiam). "Determination of an individual's earnings for Social Security purposes must be related to the reality of his [or her] connection with the labor market and cannot be based on paper allocation of income." <u>Martin v. Sullivan</u>, 894 F.2d at 1524, citing Reconsideration Redetermination at 2.

<u>Johnson v. Chater</u>, 127 F.3d 756, 758-59 (8th Cir. 1997) (emphasis added); <u>accord</u> <u>Fitzgerald v. Apfel</u>, 165 F.3d 910, 1998 WL 789188, at *2 (4th Cir. 1998); <u>Hale v. Apfel</u>, 19 F. Supp. 2d 1022, 1026 (W.D. Mo. Sept. 14, 1998); <u>Schmitz v. Callahan</u>, 973 F. Supp. 1021, 1026-27 (D. Kan. 1997), <u>aff'd</u>, 141 F.3d 1185 (10th Cir. 1998).

Kelley had not yet filed his income tax returns for the years 2008, 2009 or 2010 when he applied for benefits in October 2009. He provided the agency only with self-serving, unsupported and unverifiable estimates that his income for each relevant year would not exceed $15,000. Even after he had filed tax returns with the IRS for each year and the agency repeatedly asked him to provide his tax returns (Tr. 4, 22, 34, 42-43, 47, 57), he continued to refuse to provide them. Plaintiff submitted only an unverified "substitute Schedule C" for the years 2008, 2009 and 2010, which is not on an IRS-

issued form, but which he claimed to have filed with his tax returns.  Each purported Schedule C showed a lump sum for his alleged gross income, minus enumerated business expenses, for a net income of less than $14,160 in each year.  (Tr. 98-99, 104, 119). Although Kelley claimed that he had filed these schedules with his income tax returns, none of the Schedules C documents that he provided to the agency were supported by the complete tax return or any other objective documentation of the amounts on the schedules.

Plaintiff's argument that he is not required to submit his tax returns to the agency upon request is unsupported by citation to any law.  To the contrary, the Commissioner "may, during the course of a taxable year, request a beneficiary to estimate his or her earnings (as defined in § 404.429) for the current taxable year and for the next taxable year, and to furnish any other information about his or her earnings that the [Commissioner] may specify."  20 C.F.R. § 404.455(a).  Similarly, "[a]fter the close of his or her taxable year, the [Commissioner] may request a beneficiary to furnish a report of his or her earnings for the closed taxable year and to furnish any other information about his or her earnings for that year that the [Commissioner] may specify."  Id. § 404.455(b).

Kelley's contention in his memorandum that he "furnished a complete copy of his 2009 and 2010 tax returns to the Appeals Council and asked that they reopen the case" by letter dated September 5, 2012 is not supported by the record.  No such letter or tax

19

returns are in the record. It is undisputed that he never provided his tax returns or any other objective documentation of his earnings during the 22 months after he was notified that his benefits would be withheld until the Appeals Council's decision.

As a matter of law, the Commissioner was entitled to decide in these circumstances that Kelley had failed in his burden to prove that he was qualified to receive benefits and had failed to rebut the presumption that his earnings for each year exceeded the $14,160 annual maximum earnings. Substantial evidence supports that decision and the Commissioner's resulting decision to withhold benefits. Accordingly, Kelley's assignment of error lacks merit.

## CONCLUSION

Plaintiff's situation is entirely of his own making. He could have cured the evidentiary deficiency at any time simply by abandoning his unreasonable refusals and providing objective documentation of his annual earnings to the Commissioner. The ALJ's findings are supported by substantial evidence.

## **RECOMMENDATION**

For the foregoing reasons, IT IS RECOMMENDED that plaintiff's motion for summary judgment be DENIED and his complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of

plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[2]

New Orleans, Louisiana, this ___29th___ day of July, 2013.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[2]Douglass referred to the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.